Opinión disidente emitida por la Jueza Asociada
Señora Piol Matta,
a la que se une el Juez Presidente Señor Hernández Denton.
La norma que hoy adopta el Tribunal tendrá consecuen-cias muy graves, pues limita, de manera excesiva y total-mente innecesaria, los poderes de razón de estado de nuestra Asamblea Legislativa para aprobar medidas válidas en beneficio de la malograda economía del País. La consecuencia —deseada o no— de esta decisión es que toda acción legislativa que pretenda apoyar o beneficiar a la industria puertorriqueña sobre las demás estará sujeta a un análisis constitucional riguroso de virtual invalidación. De esa forma, la Opinión mayoritaria debilita seriamente la capacidad del Gobierno de Puerto Rico para defender, de-sarrollar, beneficiar, incentivar y reactivar nuestra economía.
A este resultado se llega partiendo de la premisa equi-vocada de que la cláusula de comercio de la Constitución *107 federal, en su estado durmiente, aplica a los hechos del presente caso. Al aceptar la alegación del peticionario, la mayoría se fija tan solo en que el caso concierne una con-tribución y una actuación gubernamental que presunta-mente da preferencia al comerciante local sobre el extranjero. Ese análisis unidimensional no toma en consi-deración la abundante jurisprudencia federal que esta-blece claras distinciones entre las situaciones que deben ser analizadas según la cláusula de comercio y las que re-quieren otro enfoque constitucional, particularmente un análisis de subsidio compelido de expresión gubernamen-tal al amparo de la cláusula de libertad de expresión, que es el que debe usarse en este caso.
Pero aun bajo su propia premisa, es decir, que la situa-ción planteada en este caso requiere determinar si se ha violado la cláusula de comercio federal, la Opinión mayori-taria adolece de dos defectos que invalidan sus conclusiones. En primer lugar, la mayoría confunde el aná-lisis ordinario requerido por el Tribunal Supremo de los Estados Unidos para ataques constitucionales a una legis-lación, de su faz o en su aplicación, con el análisis para efectos de la cláusula de comercio que distingue entre una actuación gubernamental que discrimina de su faz contra el comercio interestatal y un estatuto que discrimina contra éste en su aplicación. Por eso, el Tribunal comete el error de concluir que la contribución impuesta a los impor-tadores de carne de res no es válida, al amparo de la nor-mativa de la cláusula de comercio, por el uso que se le dio al dinero recolectado, que fue adelantar un mensaje alega-damente discriminatorio contra ellos. Como veremos, la diferencia entre una contribución discriminatoria de su faz y una que discrimina en su aplicación, en lo que concierne a la cláusula de comercio, nada tiene que ver con el “uso” que se le dé al dinero recolectado por la contribución. Tal con-clusión es ajena a toda la jurisprudencia interpretativa de dicha disposición constitucional. Dado que en este caso las *108 tasas contributivas son iguales tanto para los importado-res como para los productores locales, el escrutinio aplica-ble según la cláusula de comercio durmiente, si alguno, es el de “excesiva onerosidad”. La prueba presentada por Northwestern Selecta, Inc., la peticionaria en este caso, no sostiene la conclusión de inconstitucionalidad según ese escrutinio.
En segundo lugar, el Tribunal omite los desarrollos nor-mativos sobre la cláusula de comercio durmiente que ope-ran como excepciones a los límites establecidos por ésta y son pertinentes a esta controversia. En particular, no pro-fundiza en la doctrina del “participante en el mercado” y el poder que tienen los Estados para beneficiar a sus comer-ciantes locales sobre los de otras jurisdicciones, siempre y cuando el Estado no intervenga exclusivamente como ente regulador y, en esa función, establezca un obstáculo considerable al comercio interestatal.
Por entender que el Tribunal aplica el análisis constitu-cional equivocado y, peor aún, lo aplica equivocadamente al adoptar una normativa incompleta e innecesariamente restrictiva de la cláusula de comercio en su estado dur-miente, disiento.
I
Para identificar con precisión el análisis constitucional requerido para atender adecuadamente esta controversia, hay que indagar con mayor profundidad en los hechos del caso ante nuestra consideración.
Mediante la Ley para Crear la Oficina de la Reglamen-tación y Promoción de la Industria de la Carne de Res (Ley Núm. 95),([1]) el Gobierno de Puerto Rico adoptó como polí-tica pública el desarrollar y fortalecer la industria de la carne de res en la Isla. Según se deduce de la Exposición de
*109 Motivos de la Ley Núm. 95, “[sjiendo la carne de res [un] alimento básico de alto valor alimenticio en la dieta hu-mana, es nuestro deber dirigir todos los esfuerzos que sean necesarios para lograr el fortalecimiento y desarrollo que requiere esta empresa”([2]) La Asamblea Legislativa con-cluyó que “[l]a permanencia!,] así como la expansión de mercados existentes para la carne de res[,] son de vital importancia para el bienestar de los productores, importa-dores y otros relacionados con este mercado tan importante para la economía de la Isla”([3]) Es decir, que el propósito expreso y declarado de la Ley era promover los intereses de la industria de la carne, incluyendo productores locales e importadores([4]) Finalmente, y ante el interés apremiante del Estado de garantizar el abasto de alimentos de la po-blación, la Asamblea Legislativa declaró que “es impor-tante que la carne de res sea accesible en un mercado eficiente de manera que podamos asegurar una mejor nutrición a nuestro pueblo”([5]) De igual forma, vinculó el desarrollo de la industria de la carne de res con la “creación de fuentes de empleo”([6])
Para lograr este objetivo, la Ley delegó en dicha oficina la “responsabilidad de adoptar y poner en vigor [varios] programas y medidas orientadas a propiciar el desarrollo de una industria ganadera próspera”([7]) Es decir, la Ley no se limita a una actividad en particular, sino que abarca numerosos programas e iniciativas con miras a adelantar *110 el fin legislativo.([8]) Entre otras medidas, la Ley Núm. 95 estableció un Fondo para el Fomento de la Industria de la Carne de Res. Las aportaciones al Fondo provendrían de una contribución especial dirigida tanto a productores locales como a importadores de carne de res. A los producto-res locales se les cobraría $4.14 por cada animal sacrifi-cado en matadero y $1 por cada ternero. Por su parte, los importadores pagarían por cada libra de carne impor-tada, “tomando como base el pago hecho para el producto local en consideración al rendimiento del animal sacrifi-cado por el productor local”.([9]) Es decir, la cantidad que pagarían los importadores por cada libra importada equi-valdría, dentro de una aproximación, a lo aportado por los productores. De esa forma, la Asamblea Legislativa se ase-guró que la contribución fuese lo más semejante posible en-tre el productor y el importador, evitando así un trato discriminatorio. Por último, la Ley Núm. 95 dispuso que “[l]as aportaciones al Fondo comenzarán a ser exigibles treinta (30) días después de la vigencia de la Ley”.([10])
El texto de la Ley Núm. 95 no explica cómo se distribui-rían los recaudos del Fondo entre los diferentes programas a establecerse. No obstante, dispone que al menos el 10% de lo recaudado se utilizará para sufragar la operación y administración de la Oficina creada por el estatuto.([11])
La peticionaria Northwestern Selecta, Inc. (Northwestern) es una importadora de carne de res según definido por la Ley Núm. 95.([12]) Por lo tanto, estaba obligada a pa-gar un centavo por cada libra de carne de res importada desde el 29 de diciembre de 1992. Sin embargo, la peticio-naria no pagó la contribución impuesta por la Ley Núm. *111 95, acumulando una deuda con el E.L.A. de $301,526.28.([13]) Esta deuda representa los tres años de vigencia de la Ley Núm. 95, periodo en que Northwestern no hizo aportación alguna al Fondo.
Ante la falta de pago de Northwestern, el E.L.A. pre-sentó una demanda en cobro de dinero, alegando que la deuda era líquida, vencida y exigible. Por su parte, Northwestern sostuvo que la Ley Núm. 95 era inconstitucional por violar su derecho a la libre expresión, al obligarla a pagar una contribución que sería utilizada para sufragar una campaña dirigida por la Oficina Reglamentadora que favorecía el consumo de la carne producida localmente so-bre la carne que era importada.
Según se deduce del expediente, la campaña publicita-ria que promovía el consumo de carne de res local se inició el 14 de junio de 1995, dos años y medio después de la vigencia de la Ley Núm. 95 y de la contribución especial establecida en dicho estatuto.([14]) Northwestern, según sus propias alegaciones, no pagó la contribución especial por los primeros dos años y medio de vigencia de la Ley Núm. 95, es decir, desde antes del inicio de la campaña publici-taria que ahora impugna. Sin embargo, insiste en que no debe cantidad alguna porque la Ley Núm. 95, según apli-cada a través de la campaña publicitaria que favorecía el consumo de la carne local sobre la importada, tiene vicios constitucionales.
La peticionaria sostiene que el costo de dicha campaña publicitaria fue de $279,869.85.([15]) A su vez, quedó demos-trado que el dinero recaudado por el Fondo superó notable-mente la cantidad presuntamente invertida en la campaña publicitaria.([16]) Es decir, gran parte del dinero obtenido en *112 virtud de la Ley Núm. 95 no se utilizó para dicha campaña. En efecto, la mayor parte del dinero recaudado por el Fondo no fue utilizado para la campaña impugnada, sino que se usó para los demás fines de la Ley Núm. 95, los cuales Northwestern no ha impugnado y de los que se ha beneficiado sin aportar dinero alguno como ordena el estatuto.
Ante el Tribunal de Primera Instancia, Northwestern adelantó dos argumentos principales. En primer lugar, que la contribución dispuesta por la Ley Núm. 95 es inconsti-tucional al constituir una “imposición forzosa por parte del gobierno de una aportación económica que sería utilizada para fomentar expresiones que son contrarias a sus intereses”.([17]) Es decir, cuestionó la validez de la contribu-ción frente a su derecho a la libertad de expresión. En se-gundo lugar, cuestionó el traslado del Fondo establecido por la Ley Núm. 95 a uno de los fondos creados por la Ley Núm. 238 de 18 de septiembre de 1996 (Ley Núm. 238).([18]) Esa ley dispuso que el remanente del Fondo creado origi-nalmente por la Ley Núm. 95 para el desarrollo de toda la industria de carne de res en Puerto Rico sería trasladado a uno de los fondos creados para cada sector o grupo de sec-tores comprendidos en la industria agropecuaria. La Ley Núm. 238 excluyó a los importadores, pues el propósito del nuevo estatuto, distinto a la Ley Núm. 95, sí era fomentar la industria local.([19]) Northwestern también alegó que, como la Ley Núm. 238 no requirió la contribución de los importadores al nuevo fondo, ello tuvo el efecto retroactivo *113 de librarle del pago de las contribuciones adeudadas al am-paro de la Ley Núm. 95.
Ambas partes presentaron mociones de sentencia suma-ria ante el foro de instancia. El Tribunal de Primera Ins-tancia declaró “sin lugar” la solicitud presentada por Northwestern y, según solicitado por el E.L.A., ordenó a la peticionaria pagar la deuda de $301,526.28. Según el foro primario, la campaña publicitaria realizada con los fondos recaudados al amparo de la Ley Núm. 95 era una expre-sión gubernamental legítima y no violó el derecho consti-tucional a la libre expresión de Northwestern. ([20]) En particular, el foro primario concluyó que “resulta evidente que los fondos recaudados por las aportaciones de la Ley 95 no se destinarán exclusivamente para adelantar los intereses de la carne de res local sino que se destinarán para múlti-ples actividades en beneficio del público consumidor”. ([21]) En cuanto al segundo argumento de la peticionaria, el foro de instancia concluyó que, si hubiese sido la intención de la Asamblea Legislativa eximir a los importadores del pago de la aportación impuesta por la Ley Núm. 95 durante su vigencia, ello se hubiese hecho constar en la Ley Núm. 238.([22]) De igual forma, validó la acción legislativa de transformar el fondo creado al amparo de la Ley Núm. 95.
Northwestern recurrió al Tribunal de Apelaciones y éste confirmó la sentencia del tribunal de instancia. Según el foro apelativo, la controversia entre las partes requiere un análisis según la normativa sobre subsidio compelido de expresión gubernamental. ([23]) Aplicando la norma de United States v. United Foods, Inc.([24]) y Glickman v. Wile *114 man Bros. & Elliott, Inc.,([25]) el foro intermedio concluyó que la campaña publicitaria impugnada constituye una ex-presión legítima que adelanta un interés gubernamental sustancial y que forma parte de un esquema abarcador para atender las necesidades de la industria de la carne de res en Puerto Rico. Ante el apelativo, Northwestern alegó, por primera vez, que el cobro de la contribución al amparo de la Ley Núm. 95 y el uso parcial de lo recaudado para financiar la campaña publicitaria viola la cláusula de co-mercio de la Constitución federal en su estado durmiente. El foro apelativo no consideró los méritos de dicha conten-ción al entender que se debió haber presentado primero ante el tribunal de instancia. El Tribunal de Apelaciones también validó los cambios realizados al Fondo por la Ley Núm. 238.
Inconforme, Northwestern presentó una petición de cer-tiorari ante este Tribunal, en la que alegó la comisión de cuatro errores. Adujo que el historial legislativo de la Ley Núm. 95 demuestra que ésta tiene un objetivo discrimina-torio.![26]) También reafirmó en que la Ley Núm. 95 es con-traria a la libertad de expresión por obligarle a “financiar el mercado del producto de su competencia”.![27]) En cuanto a la impugnación de la Ley Núm. 95 al amparo de la cláu-sula de comercio, la peticionaria insistió en que el uso de la contribución requerida para promover la carne local con-virtió dicho estatuto en inconstitucional en su aplicación. Por último, repitió su posición de que la Ley Núm. 238 le liberó de su deber de pagar la contribución impuesta por la Ley Núm. 95.
Por su parte, el E.L.A. sostiene que el Fondo es parte de *115 un amplio marco reglamentario y el uso del dinero en pu-blicidad es “mínimo e incidental a actividades de diversa naturaleza subsidiadas con las aportaciones establecidas [en la Ley Núm. 95]”.([28]) En cuanto a la alegación de Northwestern de que dicha contribución violenta sus derechos a la libertad de expresión, el E.L.A. arguye que se trata de expresión gubernamental que no está sujeta al escrutinio estricto y que se fundamenta en la “legítima política pú-blica del Estado de promover la industria de la carne de res”.([29]) El E.L.A. sostiene que está adelantando el interés estatal importante de desarrollar la economía del País apo-yando a la industria de la carne de res en general. De igual forma, el Gobierno propone que la Ley Núm. 95 también tiene como objetivo salvaguardar la salud de la población. Finalmente, el E.L.A. no discute el error relacionado con la aplicación de la cláusula de comercio en su estado dur-miente, por entender que se presentó tardíamente. Como veremos, esto es crucial, pues todos los análisis referentes a la cláusula de comercio requieren que el Estado presente prueba antes de que un tribunal pase juicio sobre la incons-tiucionalidad de una ley.
II
La Opinión del Tribunal insiste en que este caso está sujeto a la normativa sobre la cláusula de comercio durmiente. Se equivoca. Igualmente, se equivoca al no re-conocer que, aun si se tratara de un caso de cláusula de comercio, están presentes algunas de las excepciones a dicha doctrina reconocidas por la jurisprudencia. Final-mente, la normativa general sobre la cláusula de comercio en su estado durmiente es diferente a la adoptada hoy por el Tribunal y es mucho menos restrictiva que lo que se *116 deduce de la Opinión. Los efectos nocivos del criterio ma-yoritario sobre las facultades de nuestra Legislatura para atender los problemas económicos del País nos requieren un análisis constitucional más adecuado.
La Constitución de Estados Unidos delega en el Con-greso el poder para regular el comercio con las naciones extranjeras y entre los diferentes Estados, así como las tribus indígenas.([30]) Por vía de esta disposición, mejor cono-cida como la cláusula de comercio, el Congreso federal tiene un poder amplio para organizar la economía nacional de Estados Unidos. Muchas de las leyes aprobadas por el Congreso surgen de sus poderes al amparo de esta cláusula. Ahora bien, además del poder afirmativo que esta disposición constitucional otorga al Congreso para actuar en cuanto al comercio interestatal, el Tribunal Supremo de Estados Unidos ha resuelto que la cláusula de comercio también tiene un efecto restrictivo sobre los poderes de los estados y demás jurisdicciones de Estados Unidos de adop-tar legislación económica que afecte el comercio interestatal.([31]) A esa doctrina se le conoce como la cláusula de comercio en su estado durmiente. Esta limitación, cuyo propósito es evitar el proteccionismo económico por parte de los gobiernos locales, existe aunque no haya acción con-gresional al amparo de la cláusula de comercio.([32]) Como veremos a continuación en más detalle, las limitaciones de *117 la cláusula de comercio en su estado durmiente aplican únicamente a actuaciones estatales de naturaleza regla-mentaria o contributiva que sean discriminatorias en sí mismas o que constituyan una carga indebida sobre el comercio interestatal y, por eso, se conviertan en un obstá-culo a la economía de Estados Unidos como conjunto.([33]) No obstante, el objetivo de impedir obstáculos locales al flujo de comercio interestatal “no eleva el libre comercio sobre todos los demás valores”([34]) Es decir, si bien, en ciertas circunstancias, la cláusula limita el poder de los estados para aprobar legislación económica,([35]) no elimina este po-der del todo. Por el contrario, los estados y demás jurisdic-ciones preservan sus poderes de razón de estado para adoptar aquellas medidas económicas que protejan la sa-lud, la seguridad y el bienestar general de sus ciudadanos. Incluso, como veremos a continuación, estos poderes pue-den emplearse de tal forma que favorezcan intereses económicos locales sobre el comercio interestatal sin que ello constituya una violación a la cláusula de comercio en su estado durmiente. ([36]) Como resolvió el Tribunal Supremo federal en Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., “[l]a cláusula de comercio no prohíbe toda acción estatal diseñada para dar a sus residentes ventajas en el mercado”.([37])
*118 La doctrina de la cláusula de comercio durmiente no ha estado exenta de críticas. Por el contrario, muchos impug-nan su existencia y validez al amparo de la Constitución federal,([38]) enfatizan los peligros de una aplicación sobre-extendida y critican su desarrollo jurisprudencial accidentado. ([39]) No es de extrañar, pues, que la jurispru-dencia más reciente del Tribunal Supremo federal apunte en dirección contraria a la que adopta la Opinión mayori-taria en este caso. Distinto a lo que hace hoy nuestro Tribunal, el Tribunal Supremo federal se ha mostrado más propenso a eliminar las restricciones a los poderes estata-les impuestos al amparo de la cláusula de comercio dur-miente y a identificar excepciones a la doctrina, todo lo cual torna en inapropiado e innecesario un análisis según *119 dicha disposición en muchos casos.([40]) Atrás quedaron las aplicaciones inflexibles de esta doctrina que hoy revive este Tribunal. ([41])
Como adelantáramos, la cláusula de comercio en su es-tado durmiente aplica únicamente cuando el estado regla-menta el comercio.([42]) Es decir, no toda participación del estado en la economía activa un análisis relacionado a la cláusula de comercio:
La Cláusula de Comercio no prohíbe toda acción estatal diseñada para dar a sus residentes una ventaja en el mercado, sino aquella acción de esa descripción en conexión con la reglamentación estatal del comercio interestatal.([43])
De igual manera, en Hughes v. Alexandria Scrap Corp., *120 426 U.S. 794 (1976), el máximo foro federal reconoció que “el hilo conductor de todos estos casos [sobre la cláusula de comercio en su estado durmiente] es que el estado inter-vino con el funcionamiento natural del mercado interesta-tal ya sea mediante una prohibición o mediante una regla-mentación onerosa”([44]) Por lo tanto, para motivar un análisis según esta disposición constitucional federal hace falta que la reglamentación impugnada incluya una acción estatal afirmativa que controle, obligue, discrimine, pro-híba o imponga sobre el comercio interestatal alguna carga indebida, y, además, obstaculice o impida el comercio interestatal. Si la acción estatal discriminatoria no obliga o prohíbe conducta, o ésta no afecta indebidamente el comer-cio interestatal, no hay violación a la cláusula de comercio durmiente.
Por el contrario, cuando el estado actúa en su rol como “participante en el mercado”, ni siquiera hay cabida para un análisis según la cláusula de comercio en su estado durmiente([45]’) En palabras del Tribunal Supremo federal, “[c]uando un gobierno local o estatal entra al mercado como un participante no está sujeto a las limitaciones de la cláusula de comercio”. (Traducción nuestra)([46]) En esos ca-sos, el estado puede entrar al mercado “para ejercer su derecho a favorecer a sus propios ciudadanos sobre otros” (traducción nuestra)/[47]) incluso si dicha participación es *121 dañina al libre comercio entre los estados.![48]) Una vez se determina que el estado actúa en su capacidad como par-ticipante del mercado y no como ente regulador, ahí cesa el análisis al amparo de la cláusula de comercio.![49]) Como ve-remos con más detenimiento al abordar el asunto especí-fico que nos ocupa en este caso, la imposición de contribu-ciones presuntamente discriminatorias, cuando la reglamentación mediante impuestos va mano a mano con una participación estatal en el mercado, tampoco procede cuestionar dicha conducta como reglamentación estatal su-jeta a la cláusula de comercio.![50]) En síntesis, la pregunta clave es si el estado está participando en el mercado o si se limita únicamente a reglamentarlo. Si se trata de la pri-mera situación o una combinación de ambas, no hay espa-cio para impugnar su actuación al amparo de la cláusula de comercio en su estado durmiente.
A modo de ejemplo, en White v. Massachusetts Council of Const. Employers, Inc., supra, el Tribunal Supremo federal validó una orden ejecutiva emitida por un alcalde que exigía que, en toda construcción hecha con fondos mu-nicipales, al menos 50% de los empleados fuesen residen-tes de la ciudad. Es decir, la ciudad discriminó afirmativa-mente contra aquellos contratistas que no emplearan una mayoría de trabajadores de la localidad. El alto foro federal reiteró la norma según la cual una vez se determina que el programa constituye una participación directa del estado en el mercado, cesa el análisis según la cláusula de comercio. A tono con dicha norma, resolvió que no había base constitucional para invalidar la medida adoptada por la ciudad en ese caso. En palabras del Tribunal Supremo:
*122 El impacto sobre los que no residen en el estado sería factor en la ecuación solamente si se decide que la ciudad está regla-mentando el mercado y no participando en éste, pues sola-mente en el primer caso es que será necesario determinar si la posible carga sobre el comercio interestatal está permitida por la cláusula de comercio.([51])
En Reeves, Inc. v. Stake,([52]) se cuestionó si un estado, en un periodo de escasez, podía disponer que el cemento que el propio estado producía se vendiera únicamente a sus residentes. Para el Tribunal, el elemento fundamental era que el estado era el vendedor del cemento. Por lo tanto, no estaba sujeto a las restricciones de la cláusula de comercio en su estado durmiente. El Tribunal Supremo concluyó que los programas estatales que están diseñados para servir a los ciudadanos que los crean, como las universidades pú-blicas estatales y las autoridades generadoras de energía, entre otras, no están sujetos a las restricciones de la cláu-sula de comercio en su vertiente durmiente.
En Hughes v. Alexandria Scrap Corp, supra, el primer caso del Tribunal Supremo de los Estados Unidos en el que se aplicó la excepción de “participante en el mercado”, se impugnó un programa estatal para la compra de chatarra de vehículos de motor abandonados que imponía requisitos más onerosos a los que no residían en el estado en contra-posición a la ciudadanía local. Dado que el estado no es-taba obligado a comprar la chatarra, sino que se obligó voluntariamente a comprarla, ello lo convertía en un par-ticipante en el mercado en concepto de comprador. Por lo tanto, al igual que cualquier entidad privada que se dedi-cara a comprar chatarra, el estado estaba en libertad de decidir a quién le compraba y bajo qué condiciones, aunque *123 ello conllevase un trato diferencial discriminatorio contra vendedores potenciales de otros estados.([53])
Además de la excepción del “participante en el merca-do”, la jurisprudencia federal ha desarrollado otras excep-ciones a la aplicación de la cláusula de comercio durmiente. Específicamente, el Tribunal Supremo de los Estados Unidos ha resuelto que una reglamentación discri-minatoria o que imponga una carga excesivamente onerosa sobre el comercio interestatal puede ser válida al amparo de la cláusula de comercio en su estado durmiente si a quien favorece es al propio estado. En United Haulers Assn. v. Oneida-Herkimer Solid Waste Management Authority, el gobierno municipal requirió, en su capacidad como ente reglamentador, que todos los desperdicios sólidos pro-ducidos en la ciudad fuesen procesados por una corpora-ción pública establecida a esos efectos; es decir, legisló a favor de un monopolio local público. El Tribunal Supremo resolvió que, si bien el municipio no podía obligar a sus residentes a usar únicamente una instalación local privada de manejo de desperdicios, sí podía hacerlo a favor de una instalación local pública. Resolvió, en conclusión, que el Estado, como ente regulador, puede discriminar contra el comercio interestatal, siempre y cuando sea en su beneficio y no en beneficio de la industria privada local. ([54])
El examen que hemos detallado hasta ahora es sola-mente el comienzo de un análisis según la cláusula de co-mercio en su estado durmiente. Obviamente, si se concluye que está presente alguna de las excepciones antes explica-das, termina el examen constitucional según esta cláusula. *124 Si, por el contrario, se concluye que el estado ha ejercido su poder exclusivamente como regulador y no como partici-pante en el mercado ni como parte de un esquema mixto “regulador-participante”, y, además, que la regulación no favorece a una entidad pública, pasamos al segundo nivel del análisis. Este nos requiere fijarnos en la intención de la ley impugnada.
Cuando se alega que un acto regulador del estado viola la cláusula de comercio durmiente es necesario determinar si dicho acto discrimina intencionalmente contra el comer-cio interestatal([55]) ya sea de la faz de su texto o en su aplicación.i([56]) Una ley estatal será discriminatoria de su faz cuando el discrimen contra el comercio interestatal surja expresamente del propio texto de la ley,([57]) por ejem-plo, cuando se establece una tasa contributiva más alta para un comerciante no-residente que para un comerciante local. En estos casos, “no hace falta mirar más allá del texto [del] estatuto para determinar que discrimina contra el comercio interestatal”. (Traducción nuestra)([58]) Por otra parte, una ley estatal es discriminatoria en su aplicación, cuando, sin decirlo expresamente, el estatuto está dise-ñado de tal manera que la aplicación práctica del texto necesariamente discriminará contra el comercio interestatal. Hay, pues, discrimen contra el comercio inter-estatal cuando la ley establece un trato diferencial basado en criterios aparentemente neutrales que, al aplicarse, producen resultados irremediablemente discrimina-torios([59]) Es decir, no se trata de analizar si la puesta en *125 vigor de una ley en un caso particular produjo un desen-lace discriminatorio, sino de si en el texto de la ley hay un esquema diseñado, implícitamente, para que toda aplica-ción del estatuto conlleve un trato distinto al comercio interestatal. En la jurisdicción federal, cuando el discri-men surge explícitamente del texto, se le conoce como “trato diferencial”; si surge implícitamente del texto, se le conoce como “impacto diferencial”.([60]) Es decir, la primera es de su faz, mientras la segunda es en su aplicación. El análisis requerido no se limita, como sugiere la mayoría, a exami-nar si la aplicación de la ley, en una circunstancia especí-fica, tiene un efecto discriminatorio contra el comercio interestatal. Se requiere, como hemos explicado, que el texto revele un esquema legislativo para establecer un trato discriminatorio al comercio interestatal.
En estos casos, en los que el discrimen se manifiesta en la aplicación de la ley, es importante auscultar la intención legislativa para determinar si se legisló con ánimo discriminatorio.![61]) Aunque la diferencia pueda ser sutil, no es lo mismo una actuación gubernamental que en determi-nado contexto produzca un resultado discriminatorio incidental y una ley cuyo texto, aunque no lo manifieste expre-samente, tenga un efecto discriminatorio intencional al ser puesto en vigor. Para efectos del análisis bajo la cláusula de *126 comercio, lo que importa es que el trato diferencial discri-minatorio esté expreso o implícito en el texto de la ley.
Según el Tribunal Supremo de Estados Unidos, “una ley discriminatoria es per se virtualmente inválida”.([62]) No obstante, el propio Tribunal nos recuerda que la acción gu-bernamental es válida si “fomenta un propósito local legí-timo que no puede ser atendido adecuadamente mediante alternativas razonables no-discriminatorias”. (Traducción nuestra).([63]) Quiere ello decir que si bien en esos casos se aplicará un escrutinio riguroso, no se requiere que el estado demuestre un interés apremiante; bastará con un interés meramente legítimo. Será fundamental demostrar que dicho interés legítimo no puede ser logrado razonablemente sin la acción estatal discriminatoria. De esa forma, la ju-risprudencia distingue entre el análisis en virtud de la cláusula de comercio durmiente y el análisis clásico de es-crutinio estricto.
Cuando la ley no resulta discriminatoria de su faz o en su aplicación, se empleará otro escrutinio, llamado al “Pike íesí”.([64]) Este postula que la acción gubernamental reguladora del comercio “será validada a menos que la carga impuesta sobre el comercio interestatal sea claramente excesiva con relación a los beneficios locales putativos”.([65]) Se trata de un análisis de balance de intereses que examina la proporcionalidad entre las cargas y beneficios resultantes de la acción estatal. Para invalidar una acción no basta que la ley impugnada afecte al comercio interestatal, ni *127 basta que imponga una carga sobre dicho comercio; esa carga debe ser “claramente excesiva” con relación al bene-ficio que se pueda obtener. ([66]) Incluso, se ha resuelto que la carga sobre el comercio interestatal debe ser onerosa y opresiva.([67]) Además, se requiere que la carga excesiva ge-nere, en la práctica, un obstáculo innecesario al comercio interestatal. ([68]) Según el Tribunal Supremo federal, las “le-yes estatales frecuentemente sobreviven este escrutinio Pike”. (Traducción nuestra).([69]) Ciertamente, no toda acción intencionalmente discriminatoria será invalidada, al igual que no toda acción no-discriminatoria sobrevivirá el escru-tinio judicial. En el primer caso, la acción intencional se presumirá inválida y el estado deberá demostrar su validez. En el segundo, la acción no discriminatoria se pre-sumirá constitucional y solamente se anulará en casos excepcionales.
En el caso ante nuestra consideración, Northwestern impugna el impuesto establecido por la Ley Núm. 95. Por lo tanto, es necesario analizar con mayor detenimiento la doctrina desarrollada por el Tribunal Supremo de Estados Unidos sobre el poder de los estados y otras jurisdicciones para imponer contribuciones y su relación con la cláusula de comercio en su estado durmiente. Como correctamente señala la Opinión mayoritaria, al analizar una medida tributaria local, se analizarán los factores siguientes: (1) si existe un nexo sustancial entre la actividad sujeta a la con-tribución y el estado que la impone; (2) si la contribución está distribuida o proporcionada equitativamente; (3) si la contribución en cuestión no discrimina contra el comercio interestatal, y (4) si la contribución está relacionada apro- *128 piadamente con los servicios provistos por el estado.([70]) También será necesario precisar el enfoque del esquema tributario, el tipo de contribución que se impugna y la ale-gada naturaleza discriminatoria del mismo.
En el contexto contributivo, “una ley discrimina si im-pone contribuciones más onerosas sobre una transacción o incidente cuando ésta cruza fronteras estatales que cuando ocurre totalmente dentro del estado”.([71]) Es decir, se analizará el cobro de la contribución, no el uso del dinero recaudado. En ese sentido, “ningún estado, de manera con-secuente con la cláusula de comercio, podrá imponer una contribución que discrimine contra el comercio interestatal proveyendo una ventaja comercial directa a los negocios locales”. (Traducción nuestra).([72]) Claro está, si la contribución es parte de un esquema que incluye la participación estatal en el mercado, se ubica fuera de las limitaciones de la cláusula de comercio en su estado durmiente.([73]) De igual forma, una contribución aparentemente discriminatoria puede ser válida si su objetivo es nivelar la cantidad total de contribuciones que pagará determinado producto.([74])
*129 Ahora bien, si la imposición de una contribución no está acompañada por una participación estatal en el mercado, la jurisprudencia del Tribunal Supremo de Estados Unidos distingue, tanto según el “per se rule” como el “Pike test”, entre impuestos regulares, subsidios en efectivo, exencio-nes contributivas y otras posibles canalizaciones del poder fiscal estatal. No se puede caer en el error de analizar toda imposición contributiva de la misma manera.
La decisión del Tribunal Supremo de Estados Unidos en Camps Newfound / Owatanna, Inc. v. Town of Harrison, Me., supra, es altamente ilustrativa para el caso de autos. En esa ocasión, el estado excluyó a las entidades que ofre-cían servicios principalmente a no residentes de la lista de organizaciones caritativas eximidas de un impuesto esta-tal sobre la propiedad. De esa forma, al no eximirlas de la contribución, impuso a las organizaciones caritativas inter-estatales una tasa contributiva mayor que a las locales. Por lo tanto, el discrimen contra el comercio interestatal era expreso en el texto de la ley; es decir, surgía de su faz, pues el criterio diferencial era la ciudadanía de los recep-tores del servicio y no era parte de un esquema mixto que incluyera alguna participación estatal en el mercado. De ese modo, se constataba el discrimen al momento de calcu-lar el impuesto([75]) Como consecuencia, en vez de aplicarse el “Pike test”, se empleó el escrutinio riguroso según el “per se rule”. El Tribunal Supremo federal, en una decisión 5-4, resolvió que la exclusión de la exención contributiva limi-tada a entidades que prestaban servicios a residentes del estado era inválida según la cláusula de comercio durmiente. Sin embargo, el propio Tribunal hace hincapié en que existe una diferencia entre un apoyo a la industria local mediante una tasa contributiva discriminatoria y el *130 subsidio directo a dicha industria proveniente de las arcas del Estado. ([76])
En New Energy Co. of Indiana v. Limbach, 486 U.S. 269 (1988), el Tribunal Supremo de Estados Unidos examinó un crédito contributivo que discriminaba contra el comercio interestatal, en tanto daba trato preferencial a la gasolina producida con etanol que se producía en el estado. Al igual que en el caso anterior, como el esquema contributivo no era parte de un régimen mixto más amplio que inclu-yera una participación estatal en el mercado, el Supremo federal concluyó que el crédito era inválido, pues su efecto necesario era imponer tasas contributivas dispares discriminatorias. Ahora bien, igual que en Camps Newfound/Owatanna, Inc. v. Town of Harrison, Me., supra, el Tribunal manifestó que el resultado sería distinto si se tratase de un programa de subsidio en efectivo.
De lo anterior se deduce la necesidad de hacer unas dis-tinciones importantes al analizar la impugnación de una contribución bajo la cláusula de comercio durmiente. En primer lugar, hay que determinar si estamos ante un es-quema puramente contributivo o uno que es parte de un régimen mixto que incluye participación estatal en el co-mercio, en cuyo caso aplicará la excepción de participante en el mercado. En segundo lugar, hay que ver si se trata de un impuesto directo o una exención contributiva, en con-traposición a un programa de subsidio o apoyo económico del estado a la industria local, pues el primero estará su-jeto a las limitaciones de la cláusula de comercio en su estado durmiente y el segundo no. Finalmente, hay que precisar si se trata de una contribución cuyo efecto es ge- *131 nerar tasas contributivas diferenciales que discriminan contra el comercio interestatal, ya sea producto de su pro-pio texto expreso o como consecuencia de su aplicación, o si, por el contrario, se está cuestionando el uso que se da al ingreso producido por la contribución. Para efectos de la cláusula de comercio en su estado durmiente, solamente el primer escenario será pertinente.
Esto nos trae, nuevamente, al asunto de la diferencia entre una ley que discrimina explícitamente, o “de su faz”, contra el comercio interestatal, y una que discrimina implícitamente o “en su aplicación”. En West Lynn Creamery, Inc. v. Healy,([77]) el Tribunal Supremo federal resolvió que lo fundamental es si la “operación práctica” del estatuto produce tasas contributivas discriminatorias.([78]) Es decir, lo que se requiere no es determinar si el dinero producido por una contribución se utilizó discriminatoriamente en un caso particular, sino si la ley fue diseñada de manera que su aplicación práctica necesariamente establecería un dis-crimen contra el comercio interestatal. En términos de una ley que impone una contribución, ello quiere decir que el estatuto debe crear una carga tributaria más onerosa contra el comercio interestatal. Reiteramos que, al referirse a la “operación práctica” del estatuto, el Tribunal se refiere a la intención legislativa discriminatoria que está implícita en el texto, en tanto y en cuanto la implantación de lo legislado necesariamente pondrá en vigor un esquema discriminatorio. No obstante, la Opinión mayoritaria llega a la conclusión de que una contribución equitativa es dis-criminatoria en su aplicación porque una parte de los fon-dos recaudados se usaron, “en la práctica”, para discrimi- *132 nar contra el comercio interestatal. La jurisprudencia federal que analiza casos de contribuciones presuntamente discriminatoria no apoya tal conclusión.
Por último, la jurisprudencia del Tribunal Supremo de Estados Unidos establece unos requisitos procesales y sustantivos que son altamente relevantes a la controversia de autos. Incluso, algunos de ellos imposibilitan que se llegue a la conclusión que hoy adopta el Tribunal. En primer lugar, cuando se impugna una acción gubernamental al amparo de la cláusula de comercio en su estado durmiente, hay que darle una oportunidad al Estado, mediante una vista evidenciaría, para presentar prueba para justificar su acción, ya sea bajo el “per se rule” o el Pike test”. Según el Tribunal Supremo federal, la vista evidenciaria y la pro-ducción de un expediente fáctico son el “componente empírico” de dichos escrutinios([79]) En su ausencia, no podemos llevar a cabo el escrutinio judicial correspondiente de ma-nera completa. Cuando se presenta por primera vez un ar-gumento de esa naturaleza en el trámite apelativo, como ha sucedido en este caso, lo que procede es devolver el caso al foro de instancia para que reciba la prueba y evalúe los argumentos al respecto([80]) En casos al amparo del “per se rule”, dado que el peso de la prueba recae sobre el Estado, hacen falta “determinaciones de hechos basadas en evidencia concreta en el expediente”([81])
En segundo lugar, debemos estar atentos a los intereses gubernamentales legítimos, sustanciales e, incluso, apre-miantes, como la integridad de los recursos naturales([82]) que pueden estar involucrados en controversias de esta naturaleza. Estos, a su vez, están íntimamente relaciona- *133 dos con los poderes de razón de estado de la Asamblea Legislativa. ([83])
En síntesis, la cláusula de comercio en su estado dur-miente aplica únicamente en aquellos casos en los que el estado ha actuado exclusivamente en su capacidad como ente regulador. En cuanto a su facultad de imponer contri-buciones, la aplicación de la cláusula dependerá de si es parte de un esquema mixto que incluye participación esta-tal en el mercado. Si la acción gubernamental impugnada es producto de la participación del estado en el mercado o de regulación a favor suyo, al igual que si es parte de un esquema mixto, no aplicarán las restricciones de la cláu-sula de comercio en su estado durmiente. En aquellos ca-sos donde, en efecto, la acción impugnada sea producto de las facultades reguladoras de un gobierno local, el escruti-nio dependerá de si se trata de una legislación discrimina-toria o de una actuación gubernamental neutral que afecta el comercio interestatal. Una ley se considerará discrimi-natoria si establece un trato diferencial para el comercio interestatal frente al comercio local. Dicho discrimen puede manifestarse de dos maneras: de su faz, es decir, que del texto de la ley surja expresa y abiertamente el discri-men; o en su aplicación, es decir, que la puesta en vigor del texto tendrá un resultado discriminatorio en la práctica. En el caso específico de los impuestos, el discrimen puede ser de su faz, mediante tasas contributivas que abierta-mente establecen un trato diferencial entre el comercio in-terestatal y el comercio local, o en su aplicación, a través de un diseño textual que produce, en la práctica, tasas con-tributivas discriminatorias.
Una ley promulgada por un estado actuando en su ca-pacidad como ente regulador, que sea discriminatoria tanto de su faz como en su aplicación, estará sujeta al escrutinio riguroso establecido en el “per se rule”. Al amparo de este *134 análisis, la ley se presumirá inválida, a menos que el Es-tado demuestre que ésta adelanta un propósito local legí-timo que no puede ser atendido adecuadamente mediante alternativas razonables no discriminatorias. En estos ca-sos hará falta una vista evidenciaría para que el estado presente prueba que justifique su acción. Por el contrario, si la ley no es discriminatoria, se aplicará el “Pike test”. A esos efectos, la ley será válida a menos que la carga im-puesta sobre el comercio interestatal sea claramente exce-siva con relación a los beneficios locales pretendidos y constituya un obstáculo innecesario al flujo libre del comercio. Se trata de un balance de intereses que tiende a favorecer al Estado.
Por último, el que una actuación gubernamental no esté sujeta a un análisis al amparo de la cláusula de comercio en su estado durmiente o, incluso, sobreviva dicho análisis, no significa el fin de la revisión judicial. Esto es particular-mente cierto en casos sobre tasas contributivas. Como explicó el Tribunal Supremo federal en General Motors Corp. v. Tracy, “en algunas circunstancias peculiares, ciertas cla-sificaciones contributivas que son discriminatorias de su faz contra el comercio interestatal pueden violar la cláu-sula de igual protección [de las leyes] a pesar de que pasen el cedazo de la cláusula de comercio”. (Traducción nuestra).([84]) Evidentemente, un gobierno local, incluso en su rol como participante en el mercado, no puede actuar contrario a otras obligaciones constitucionales.([85]) La juris-prudencia federal ha analizado ataques a leyes económicas estatales que incluyen impugnaciones al amparo de la cláusula de comercio a la vez que otras disposiciones *135 constitucionales. Las más discutidas son la cláusula de igual protección de las leyes y la cláusula de privilegios e inmunidades. En Hughes v. Alexandria Scrap Corp., se atacó el programa de compra de chatarra de vehículos de motor tanto al amparo de la cláusula de comercio en su estado durmiente como al amparo de la cláusula de igual protección de las leyes. En cuanto a ésta, el Tribunal Supremo federal resolvió que la diferenciación entre residen-tes y no residentes para efectos de dicho programa no in-fringía “ningún interés fundamental”. ([86]) En particular, dado que se trataba de una clasificación que se refería “únicamente a asuntos económicos”, el Tribunal concluyó que ésta “no tiene que ser diseñada para que se ajuste con precisión al propósito legítimo que lo inspira”. (Traducción nuestra). ([87])
Por otra parte, en United Building Trades v. Mayor of Camden, el Tribunal Supremo federal discutió un ataque al amparo de la cláusula de privilegios e inmunidades a una ordenanza municipal que exigía que el 40% de los tra-bajadores en proyectos municipales fuesen residentes de la ciudad. ([88]) Según el Tribunal,
a aplicación de la Cláusula de Privilegios e Inmunidades a una instancia particular de discrimen contra quienes residen fuera del estado conlleva un análisis en dos etapas. Como asunto inicial, el tribunal debe decidir si la ordenanza establece una carga a uno de los privilegios e inmunidades protegidos por la Cláusula. No todas las formas de discrimen contra ciudadanos de otros estados son sospechosas constitucionalmente. (Traducción nuestra).([89])
*136 En este caso, se consideró el interés de un ciudadano en conseguir empleo en una obra pública en otro estado. Se-gún el foro federal, debe determinarse si la protección de ese interés es “fundamental para la promoción de la armo-nía interes tataF.([90]) Una vez se concluye que sí y que se ha afectado un privilegio o inmunidad protegido constitucio-nalmente, se pasará a la segunda parte del análisis, que requiere determinar si existe una “razón sustancial para el tratamiento diferencial ... y si el grado de discrimen tiene una relación estrecha [con esa razón]”. (Traducción nuestra).([91]) El Tribunal Supremo fue enfático en no admi-tir un argumento al amparo de la cláusula de comercio en su estado durmiente con respecto a estos hechos.([92]) Por eso, concluyó que en “[t]odo análisis bajo la Cláusula de Privilegios e Inmunidades debe darse la consideración de-bida al principio de que los estados deben tener amplia libertad al analizar males locales y prescribir curas apropiadas”. (Traducción nuestra).([93]) En este caso particular, ante la ausencia de un expediente probatorio ade-cuado, el Tribunal no pasó juicio sobre los méritos de la impugnación. ([94])
*137 III
En el caso de autos, se impugna el impuesto establecido en la Ley Núm. 95 por ser alegadamente discriminatorio. El argumento de Northwestern, que el Tribunal acoge, es que, como los fondos recaudados fueron empleados parcial-mente en una campaña que impulsaba la carne de res local, se violó la cláusula de comercio en su estado durmiente al convertir el impuesto en discriminatorio en su aplicación. Como vimos, la normativa vigente no admite esta conclusión.
Un impuesto puede ser discriminatorio al amparo de la cláusula de comercio en su estado durmiente si produce una tasa contributiva que establece diferencias entre el co-mercio interestatal y el comercio local. Ello puede surgir del texto expreso de la ley o de la aplicación del mismo puede producir dicho resultado. En el caso de autos, el im-puesto establecido por la Ley Núm. 95 no es discriminatorio. Del propio texto del estatuto surge una equivalencia entre las cargas contributivas. La Asamblea Legislativa, consciente precisamente de que no se podía establecer un impuesto universal a importadores y produc-tores debido a la naturaleza de sus productos, optó por im-ponerle a los primeros un impuesto por libra importada y a los segundos por animal sacrificado. La contribución im-puesta por libra a los importadores equivale al peso típico de un animal sacrificado por un productor local. Es decir, tanto de su faz como en su aplicación, la contribución esta-blecida por la Ley Núm. 95 no es discriminatoria. Por lo tanto, no aplica el análisis del “per se rule”. Pero, aunque se entendiera que ese es el análisis requerido, el Tribunal tiene la obligación, conforme a los precedentes del Tribunal Supremo de Estados Unidos, de devolver el caso al foro de instancia para la celebración de un juicio en sus méritos *138 en el que se dé la oportunidad al Estado de presentar prueba. En ese caso, el Estado tendrá que demostrar que la medida responde a un interés legítimo suyo, como atender la crisis económica o garantizar el abastecimiento nutricio-nal de la población, y que éste no se puede atender de ma-nera adecuada mediante otra alternativa no discriminato-ria razonable.
Reitero, sin embargo, que en todo caso, el análisis reque-rido sería el que corresponde al “Pike test”, ya que la tasa contributiva no es discriminatoria. La parte demandada no ha ofrecido argumento persuasivo alguno de que la carga contributiva de 10 por cada libra de res importada consti-tuya una carga excesiva u onerosa ni tampoco que obstacu-lice el comercio interestatal. En ese sentido, aún si se apli-cara la cláusula de comercio a los hechos de este caso, no hay duda que la contribución sobrevive el “Pike test”.
Además, no podemos olvidar que la contribución esta-blecida por la Ley Núm. 95 es parte de un esquema más amplio que incluye una participación estatal en el mercado, a través de la campaña publicitaria en la que el Estado difundió su opinión sobre los productos. De la misma ma-nera que el Estado, como participante del mercado, puede decidir cuáles productos comprar y cuáles no comprar, también puede recomendarle al pueblo consumidor cuáles productos comprar y cuáles no.([95]) Ello es permisible al am-paro de la cláusula de comercio. Lo que no podría hacer el Estado es obligar a la compra de la carne de res local.([96]) *139 Pero aquí el Gobierno no ha hecho eso, pues no ha apro-bado reglamentación alguna que obligue al consumo local. Por lo tanto, al estar ante un esquema mixto que incluye la participación del Estado en el mercado, no cabe analizar la Ley Núm. 95 según la cláusula de comercio en su estado durmiente.
Finalmente, no podemos pasar por alto el hecho de que Northwestern no pagó la contribución durante dos años y medio antes de que se iniciara la campaña. ¿Por qué Northwestern no pagó la contribución si aún no sabía que se llevaría a cabo la campaña que hoy alega justifica su falta de pago? Tampoco podemos pasar por alto el hecho de que el Fondo establecido por la Ley Núm. 95 es considerable-mente mayor que la cantidad de dinero invertido en la campaña impugnada.([97]) Es decir, que Northwestern, so pretexto de no sufragar dicha campaña, pretende zafarse de su responsabilidad de financiar los demás programas de la Oficina Reglamentadora, incluyendo el 10% separado para el financiamiento de dicha Oficina. Avalar esto es per-mitir que Northwestern se beneficie de la Ley Núm. 95 sin que tenga que aportar un solo centavo.
Entiendo que la mayoría se equivoca al concluir que la cláusula de comercio en su estado durmiente aplica a los hechos de autos y que la contribución es discriminatoria en su aplicación. También se equivoca al no darle al Estado la oportunidad de presentar prueba para cumplir con su carga probatoria y al eximir a Northwestern de su obliga-ción legal con el fisco más allá de la campaña impugnada.
IV
Ahora bien, como adelantáramos, el escrutinio judicial no finaliza al concluir que una acción gubernamental no *140 está sujeta a un análisis al amparo de la cláusula de co-mercio en su estado durmiente, o que, de estarlo, lo ha superado. Desde el principio, Northwestern alegó que el uso del dinero recaudado al amparo de la Ley Núm. 95 en una campaña que favorecía el consumo de la carne de res local violaba su derecho a la libre expresión al obligarle a subsidiar una expresión gubernamental con la que está en desacuerdo y que afecta sus intereses económicos. En efecto, la doctrina de subsidio compelido nos brinda el aná-lisis constitucional correcto que debe aplicarse a los hechos de este caso. Se trata de una doctrina desarrollada, princi-palmente, por el Tribunal Supremo de Estados Unidos cuya jurisprudencia examinaremos en detalle.
El derecho constitucional fundamental a la libertad de expresión tiene dos manifestaciones principales: el derecho a expresar nuestros pensamientos libremente y el derecho a permanecer callados cuando no queremos hablar.([98]) Esta segunda manifestación da lugar a la doctrina de la expre-sión compelida, que protege al ciudadano del poder del es-tado para obligar a la expresión. Demás está decir que este tipo de acción estatal es vista con gran suspicacia. ([99])
En este caso, sin embargo, el Estado no está obligando a nadie a expresarse. Por el contrario, lo que está haciendo es obligar al subsidio de un mensaje expresado por otro (“subsidio compelido” o “subsidized speech”). Por mucho tiempo, las controversias sobre este tipo de acción estatal surgieron cuando personas que eran obligadas por ley a pertenecer a ciertas organizaciones, como un colegio de abogados o un sindicato laboral, objetaban que se usaran *141 sus cuotas para expresar mensajes de corte ideológico con los que estaban en desacuerdo. En esos casos, siempre y cuando tal expresión no estuviese relacionada con los fines del grupo, el Tribunal Supremo federal permitió a los miembros objetar aquella parte de su cuota que estaba des-tinada a dichos mensajes ideológicos.([100])
En Glickman v. Wileman Bros. & Elliott, Inc. ,([101]) el Tribunal Supremo atendió un ataque constitucional a una ley federal que imponía un impuesto especial a ciertos produc-tores agrícolas como parte de un esquema estatutario am-plio que incluía varios programas para impulsar la agricul-tura, incluyendo el establecimiento de una oficina administrativa para esos efectos y una campaña publicita-ria genérica para fomentar el consumo general de los productos. Algunos productores entendieron que la contri-bución constituía una expresión compelida inconstitucio-nal, pues estaban en desacuerdo con el contenido de la campaña publicitaria. El Tribunal Supremo federal validó la ley, al entender que la campaña publicitaria objetada era meramente accesoria al esquema estatutario impugnado.([102]) Según el alto foro federal, “[t]res caracte-rísticas del esquema regulatorio en controversia lo distin-guen de otras leyes que hemos determinado que coartan la libertad de expresión protegida por la Primera Enmienda”.([103]) Éstas eran, en primer lugar, que la ley no prohibía que los productores hicieran, sus propias campa-ñas publicitarias; en segundo lugar, que no se obligaba a nadie a incurrir en expresión simbólica o real y, final-mente, que no se obligaba a los productores a endosar o *142 financiar ningún punto de vista político o ideológico([104]) Se-gún el foro federal, a pesar de que los productores no esta-ban de acuerdo con el mensaje diseminado por la campaña, “no se puede decir que esto engendre crisis de conciencia alguna”([105]) Por lo tanto, el Tribunal Supremo resolvió que el Estado puede, como parte de un esquema regulatorio amplio, obligar a un sector a pagar una contribución desti-nada a financiar una campaña con cuyo contenido difieren.
Unos años después, en United States v. United Foods, Inc. ,([106]) al invalidar una ley que obligaba a unos producto-res de setas a pagar una contribución especial para finan-ciar una campaña publicitaria con la que estaban en des-acuerdo, el Tribunal restringió el alcance del fallo emitido en Glickman. Resolvió entonces que, como la ley única-mente establecía una campaña publicitaria, sin más, no se justificaba la acción estatal. Es decir, la campaña publici-taria no era parte de un esquema estatutario amplio y, como consecuencia, casi todo el dinero recaudado era para dicha campaña([107])
Ahora bien, en Johanns v. Livestock Marketing Ass’n,([108]) el Tribunal Supremo examinó la controversia nuevamente y resolvió que la distinción entre Glickman y United Foods no aplica cuando la expresión a cuyo subsidio se compelía era gubernamental.([109]) En este caso, se retó la “Beef Promotion and Research Act of 1985” que “anunciaba una política federal de promover el mercadeo y consumo de la carne de res y productos derivados, usando fondos recau- *143 dados por un impuesto a la venta de ganado y la importación”.([110]) Como parte del esquema estatutario, se estableció una campaña publicitaria. Ciertos productores de ganado la objetaron y alegaron que no se les podía im-poner una contribución para financiar un mensaje con el que estaban en desacuerdo.
En su discusión, el Tribunal Supremo identifica los diferentes tipos de casos que pueden surgir cuando se pre-senta un reto de esta naturaleza a la libertad de expresión:
Hemos sostenido retos bajo la Primera Enmienda a expre-sión alegadamente competida en dos categorías de casos: casos verdaderamente de “expresión competida”, en los que a un in-dividuo se le obliga a expresar personalmente un mensaje con el que está en desacuerdo, impuesto por el gobierno; y casos de “subsidio compelido”, en los que el gobierno le requiere a un individuo que subsidie un mensaje con el cual está en des-acuerdo, expresado por una entidad privada. Hasta ahora no habíamos considerado las consecuencias bajo la Primera En-mienda del subsidio compelido por el gobierno de la expresión del propio gobierno([111])
Según el Tribunal Supremo federal, la validez del sub-sidio compelido de entidades privadas se sostendrá si la expresión subsidiada es germana a los fines del grupo pri-vado o si es parte de un esquema regulatorio amplio.([112]) Pero, cuando el mensaje a cuyo subsidio se obliga es una expresión gubernamental, no cabe un ataque al amparo de la Primera Enmienda([113])
*144 En Johanns v. Livestock Mktg. Ass’n, los demandantes adelantaron dos argumentos adicionales para sostener que no aplicaba la excepción del subsidio compelido de la ex-presión gubernamental. Señalaron, en primer lugar, que el Comité encargado de implementar la ley federal y diseñar la campaña publicitaria estaba compuesto tanto por fun-cionarios públicos como por personas provenientes de la esfera privada. El Tribunal Supremo resolvió que, como los miembros del Comité podían ser removidos por el Secreta-rio de Agricultura, y, más importante aún, resultaba evi-dente que el mensaje que sería diseminado era controlado por el gobierno, no había duda que la campaña constituía una expresión gubernamental. En segundo lugar, los de-mandantes alegaron que, si el gobierno quería hacer una campaña para diseminar su expresión, tenía que finan-ciarla con el fondo general del Estado, no mediante un im-puesto especial a los productores. El Tribunal Supremo re-chazó ese argumento: “El análisis de subsidio compelido no se ve afectado en nada por que los fondos para la promo-ción provengan de impuestos generales o mediante una contribución especial”.([114]) Esta conclusión es fundamental, sobre todo al considerar que en un análisis al amparo de la cláusula de comercio en su estado durmiente, el Tribunal Supremo ha resuelto que se permite el subsidio directo del gobierno a la empresa privada local, independientemente de si los fondos usados provienen de las contribuciones ge-nerales o de un impuesto especial. Es decir, en ambos casos, tanto según el análisis de subsidio compelido como según el análisis de cláusula de comercio durmiente, no importa si la acción gubernamental de apoyar a la empresa local es financiada por el fondo general del estado o por un im-puesto especial a determinada industria.
Resulta evidente que el caso que determina la contro- *145 versia ante nuestra consideración es Johanns v. Livestock Mktg. Ass’n. La campaña realizada por la Oficina Regla-mentadora, organismo evidentemente gubernamental, al amparo de la Ley Núm. 95, constituye una expresión gu-bernamental legítima para adelantar la política pública de promover el consumo de la carne de res, enfatizando en la carne de res local. Por lo tanto, la contribución establecida por la Ley Núm. 95 constituye igualmente un subsidio compelido de una expresión gubernamental que no está sujeta a las restricciones del derecho a la libre expresión. Incluso, de entenderse que aplica la línea de casos de Glic-kman y United Foods, no cabe duda que la Ley Núm. 95 es un esquema estatutario amplio que no se limita al finan-ciamiento de una campaña publicitaria, pues solamente una porción minoritaria de los fondos recaudados han sido utilizados en ésta y la Ley establece otros programas para impulsar la política pública. Por lo tanto, aplicaría la doc-trina establecida en Glickman. Indudablemente, es forzosa la conclusión de que el impuesto establecido por la Ley Núm. 95 es constitucional.
No toda expresión gubernamental es necesariamente constitucional y el Estado no puede, mediante su expre-sión, violentar otras disposiciones constitucionales. Ahora bien, dado que Northwestern no hizo alegación alguna de igual protección de las leyes o al amparo de la cláusula de privilegios e inmunidades, no nos embarcaremos en un análisis en esa dirección. De todos modos, el tipo de clasi-ficación involucrado en esta controversia solamente re-quiere un análisis de razonabilidad y nada en el expe-diente nos permite cuestionar la presunción de constitu-cionalidad que tienen las leyes impugnadas.
Por lo anteriormente expuesto, disiento enfáticamente de la Opinión del Tribunal. Espero que, en el futuro, este Tribunal tenga la oportunidad de considerar nuevamente este tema, pues esta decisión no es sólo errada en derecho, sino que su única consecuencia práctica es restringir inne- *146 cesariamente el poder de nuestra legislatura para desarro-llar nuestra economía en beneficio del Pueblo.

(1) Ley Núm. 95-1992 (5 L.P.R.A. sees. 3001-3012).

(2) 1992 (Parte 1) Leyes de Puerto Rico 615.

(3) (Énfasis suplido). íd.

(4) Según la Ley Núm. 95, entre los fines y propósitos del estatuto está “[plromover el mercado ordenado tanto de la carne de res producida localmente así como la importada”. (Énfasis suplido). 5 L.P.R.A. see. 3003. A través de todo el esta-tuto se pueden notar referencias tanto al productor local como al importador de carne. 5 L.P.R.A. sees. 3001, 3005(b), entre otras.

(5) Leyes de Puerto Rico, supra, pág. 615.

(6) 5 L.P.R.A. sec. 3005(d).

(7) 5 L.P.R.A. see. 3002.

(8) Según la Ley Núm. 95, la Oficina tiene el “propósito principal de promover actividades, programas y servicios que propicien el desarrollo y fortalecimiento de la industria de la carne de res en Puerto Rico”. 5 L.P.R.A. see. 3003.

(9) 5 L.P.R.A. see. 3008.

(10) íd.

(11) 5 L.P.R.A. see. 3003.

(12) 5 L.P.R.A. see. 3001.

(13) Sentencia del Tribunal de Primera Instancia, pág. 1; Apéndice de la Petición de certiorari, pág. 75.

(14) Petición de certiorari, pág. 4.

(15) íd.

(16) A modo de ejemplo, según el Informe Mensual correspondiente a junio de 1995 de la Oficina para la Reglamentación de la Industria de la Carne de Res, el *112 total de fondos acumulados en el año fiscal 1994-1995 fue de $769,575.86; Apéndice de la Petición de certiorari, pág. 117. No obstante, las partes no nos han suminis-trado información que nos permita saber la totalidad de los fondos recaudados du-rante la vigencia de la Ley Núm. 95. Lo que sí podemos colegir de la información previamente descrita es que el dinero utilizado en la campaña impugnada repre-senta una fracción del total de fondos recaudados por la Ley Núm. 95.

(17) Sentencia del Tribunal de Apelaciones, pág. 8; Apéndice de la Petición de certiorari, pág. 10.

(18) Ley para el Ordenamiento de las Industrias Agropecuarias de Puerto Rico, 5 L.P.R.A. sees. 3051-3061.

(19) 5 L.P.R.A. see. 3056.

(20) Sentencia del Tribunal de Primera Instancia, pág. 12; Apéndice de la Peti-ción de certiorari, pág. 86.

(21) íd.

(22) Id., pág. 20, Apéndice de la Petición de certiorari, pág. 94.

(23) Sentencia del Tribunal de Apelaciones, pág. 11, Apéndice de la Petición de certiorari, pág. 13.

(24) 533 U.S. 405 (2001).

(25) 521 U.S. 457 (1997).

(26) No obstante, las porciones del historial legislativo que Northwestern pre-senta tienden a confirmar que la Ley Núm. 95 no es discriminatoria. Por ejemplo, se hace referencia a las expresiones del entonces Secretario de Agricultura quien, ante una pregunta sobre si la Ley Núm. 95 ayudaría a la industria local de carne, éste contesta que el Fondo establecido por dicho estatuto no tiene como propósito promo-ver los productos locales. Véase Petición de certiorari, pág. 7.

(27) íd., pág. 9.

(28) Alegato del Estado Libre Asociado de Puerto Rico, pág. 5, Apéndice de la Petición de certiorari, pág. 371.

(29) íd.

(30) Constitución de Estados Unidos, U.S.C.A. Art. I, Sec. 8, cl. 3. “The Congress shall have the Power ... [t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes”.

(31) Camps Newfound / Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 571 (1997).

(32) Department of Revenue of Ky. v. Davis, 553 U.S. 328, 337-338 (2008). En sentido contrario, el Congreso federal puede autorizar que un estado o jurisdicción adopte reglamentación que de otra forma estaría prohibida al amparo de la cláusula de comercio durmiente. Maine v. Taylor, 477 U.S. 131, 138 (1986). Según el Tribunal Supremo federal, el origen de esta doctrina reside en la preocupación dual de los constituyentes estadounidenses por que no se produjera la llamada “balcanización” de la economía, y que tampoco, a nombre de este objetivo unificador, se prescindiera del federalismo y la autonomía local. Department of Revenue of Ky. v. Davis, supra, pág. 338. Véase, además, United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330, 338 (2007).

(33) General Motors Company v. Tracy, 519 U.S. 278, 287 (1997): “The negative or dormant implication of the Commerce Clause prohibits state taxation ... or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace”. Véase, además, Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 803 (1976).

(34) (Enfasis suplido). United Haulers Assn., Inc. v. Oneida, supra, pág. 344, citando a Maine v. Taylor, 4Ü1 U.S. 131, 151 (1986): “The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values". (Énfasis suplido).

(35) Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 271 (1984).

(36) Id. “No one disputes that a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry”. (Énfasis suplido).

(37) (Traducción nuestra). Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., supra, pág. 591. “The Commerce Clause does not prohibit all state action *118 designed to give its residents an advantage in the marketplace”. Al igual que muchos otros análisis de índole constitucional, al examinar esta cláusula no cabe una visión mecánica ni una aplicación automática. Véase United Building Trades v. Mayor of Camden, 465 U.S. 208, 219 (1984). Tampoco podemos olvidar que el análisis al am-paro de la cláusula de comercio durmiente no es de naturaleza sustantiva; su única finalidad es determinar si la acción estatal tiene un propósito discriminatorio, sin justificación para ello, o, si no lo tiene, cuál es su efecto sobre el comercio interestatal. Al amparo de un análisis de cláusula de comercio no hace falta que el estado presente una justificación independiente para su proceder. Hughes v. Alexandria Scrap Corp., supra, pág. 809. “We do not believe the Commerce Clause was intended to require independent justification for such action”. Véase, además, White v. Massachusetts Council of Const. Employers, 460 U.S. 204, 207 (1983).

(38) A modo de ejemplo, el Juez Asociado del Tribunal Supremo de Estados Uni-dos, Clarence Thomas, ha sostenido enfáticamente que la doctrina de la cláusula de comercio en su estado durmiente no tiene base alguna en la Constitución y que descartaría toda la jurisprudencia federal a esos efectos. “I would entirely discard the Court’s negative Commerce Clause jurisprudence. ... [It] has no basis in the Constitution”. Department of Revenue of Ky. v. Davis, supra, pág. 361 (Thomas, concurrente). Véase, además, United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 349 (Thomas, concurrente).

(39) Otro crítico de la doctrina de la cláusula de comercio en su estado durmiente es el Juez Asociado Antonin Scalia. En su expresión disidente en Camps Newfound / Owatonna v. Town of Harrison, Me. en 1997, a la que se unieron los jueces Rehnquist, Ginsburg y Thomas, el juez Scalia sostiene que la doctrina de la cláusula de comercio durmiente se ha desviado de su origen. Id., pág. 595 (Scalia, disidente). “The Court’s negative Commerce Clause jurisprudence has drifted far from its moorings”. Desde entonces, el alto foro federal ha limitado considerablemente las restricciones bajo esta figura. Véase, además, Department of Revenue of Ky. v. Davis, supra, pág. 359 (Scalia, concurrente) y United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 348 (Scalia, concurrente).

(40) Véanse, por ejemplo: Department of Revenue of Ky. v. Davis, supra; United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra; American Trucking Assns., Inc v. Michigan Pub. Sen. Comm’n, 545 U.S. 429 (2005); General Motors Corp. v. Tracy, supra.

(41) Durante las décadas de 1930 y 1940, el Tribunal Supremo de Estados Uni-dos amplió considerablemente el radio de aplicación de la cláusula de comercio en su estado durmiente. Véanse, por ejemplo: Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935); H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525 (1949). Es en esos casos que vemos referencias a que la unidad económica nacional de Estados Unidos es inque-brantable, así como prohibiciones a la reglamentación estatal discriminatoria o ex-cesivamente obstaculizadora. No podemos perder de perspectiva que estos casos se resolvieron en un momento particular en la historia de ese país en el que se estaban afirmando los poderes del gobierno federal al amparo de la cláusula de comercio. Las expresiones más recientes del Tribunal Supremo de Estados Unidos se han alejado de ese nacionalismo económico a favor de reconocer el rol de los gobiernos locales frente a sus respectivos retos económicos.

(42) Department of Revenue of Ky. v. Davis, supra, págs. 337-338. “The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism, that is regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors”. (Enfasis suplido). Cabe mencionar que en este caso el Tribunal Supremo federal validó la acción gu-bernamental impugnada por entender que el estado lio actuó exclusivamente en su rol como reglamentador de la actividad económica. Id., pág. 348. Véanse, además: Maine v. Taylor, supra, pág. 138 (“In determining whether a State has overstepped its role in regulating interstate commerce ...” (énfasis suplido)); Granholm v. Heald, 544 U.S. 460 (2005).

(43) (Énfasis en el original). New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 278 (1988). “The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description, in connection with the State’s regulation of interstate commerce”. (Énfasis en el original).

(44) (Traducción y énfasis suplidos). Hughes v. Alexandria Scrap Corp., supra, pág. 806. “The common thread of all these cases is that the State interfered with the natural functioning of the_ interstate market either through prohibition or through burdensome regulation”. (Énfasis suplido).

(45) New Energy Co. of Indiana v. Limbach, supra, pág. 277. “[The market participant doctrine] differenciates between a State’s acting in its distinctive governmental capacity, and a State’s acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause”.

(46) Department of Revenue of Ky. v. Davis, supra, pág. 339. “When a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause”.

(47) Id. “[S]o as to exercise the right to favor their own citizens over others”.

(48) íd., pág. 353.

(49) íd.

(50) íd., págs. 347-348. “In sum, our cases on market regulation without market participation prescribe standard dormant Commerce Clause analysis; our cases on market participation joined with regulation (the usual situation) prescribe exceptional treatment for this direct governmental activity in commercial markets for the public benefit”. (Enfasis suplido).

(51) (lYaducción y énfasis suplidos). White v. Massachusetts Council of Const. Employers, Inc., supra, pág. 210. “Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause”. (Enfasis suplido).

(52) 447 u s 429 (1980).

(53) iguai ocurrió en New Energy Co. Of Indiana v. Limbach, supra. En dicho caso, el Tribunal Supremo federal resolvió que “cuando un estado decide manufacturar y vender cemento, sus métodos de negocio, incluyendo aquellos que favorecen a sus residentes, no constituyen mayor problema constitucional que los de un negocio privado”. (Traducción y énfasis suplidos). íd., pág. 277. “[W]hen a State chooses to manufacture and sell cement, its business methods, including those that favor its residents, are of no greater constitutional concern than those of a private business”. Id. (Enfasis suplido).

(54) United Haulers Assn. v. Oneida-Herkimer Solid Waste Management Authority supra.

(55) Department of Revenue of Ky. v. Davis, supra, pág. 338.

(56) Maine v. Taylor, supra, pág. 138. “[0]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect ...”.

(57) United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 338.

(58) Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., supra, págs. 575-576. “It is not necessary to look beyond the text of [the] statute to determine that it discriminates against interstate commerce”.

(59) véase American Trucking Assns., Inc v. Michigan Pub. Serv. Comm’n, supra. Ejemplo de esto podría ser una ley que trate distinto a un comerciante cuyo *125 producto sea enlatado el día antes de su venta en Puerto Rico, frente a otro cuyo producto sea enlatado más de un día antes de su venta. No obstante la adopción de unos criterios aparentemente neutrales, la fecha de enlatado y la de la venta, el primer comerciante necesariamente será local y el segundo tenderá a ser extranjero.

(60) Natural Paint & Coatings Ass’n v. City of Chicago, 45 F.3d 1124, 1131 (1995). “State and local laws affecting commerce may be put into one of three categories. The first category comprises laws that explicitly discriminate against interstate commerce. [The city] might, for example, forbid the sale of spray paint manufactured outside [the State].... The second category comprises laws that appear to be neutral among states but bear more heavily on interstate commerce than on local commerce. One state’s law setting a 55-foot limit for trailers when all nearby states permit 65-foot trailers bears more heavily on vehicles from other states .... [T]he Court treats it as equivalent to a statute discriminating in terms .... If the first category may be called disparate treatment, and the second disparate impact, the third category comprises laws that affect commerce without any reallocation among jurisdictions ...”. (Citas omitidas y énfasis suplido).

(61) Bacchus Imports, Ltd. v. Dias, supra, pág. 270.

(62) (Traducción nuestra). Department of Revenue of Ky. v. Davis, supra, pág. 328. “A discriminatory law is virtually per se invalid”. Véase, además, Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., supra, pág. 575.

(63) (Traducción nuestra). íd., pág. 581. “[If it] ‘advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives’ ”.

(64) Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).

(65) (Traducción y énfasis suplidos). Department of Revenue of Ky. v. Davis, supra, págs. 338-339. “Absent discrimination for the forbidden purpose, however, the law will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits”. (Enfasis suplido).

(66) Id., pág. 353. “[M]ay be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice”.

(67) “Undue burden” (General Motors Corp. v. Tracy, supra, pág. 298 esc. 12); “Oppressive burdens” (Bacchus Imports, Ltd. v. Dias, supra, pág. 272).

(68) Maine v. Taylor, supra, pág. 151. “[N]eedlessly obstructs] interstate trade”.

(69) Department of Revenue of Ky. v. Davis, supra, pág. 339. “State laws frequently survive this Pike scrutiny”.

(70) Opinión mayoritaria, pág. 75.

(71) (Énfasis suplido). Fulton Corp. v. Faulkner, 516 U.S. 325, 331 (1996). “With respect to taxation ... a law [is discriminatory] if it taxes a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State”.

(72) Bacchus Imports, Ltd. v. Dias, supra, pág. 268. “[N]o State, consistent with the Commerce Clause, may impose a tax which discriminates against interstate commerce by providing a direct commercial advantage to local business”.

(73) Véase la diferencia entre Department of Revenue of Ky. v. Davis, supra, caso en que el Tribunal Supremo de los Éstados Unidos validó un esquema contributivo discriminatorio que imponía contribuciones más altas a los intereses producidos por bonos de fuera del estado en contraposición a bonos locales, y Bacchus Imports, Ltd. v. Dias, supra, en el que se invalidó un impuesto más alto al vino proveniente de fuera del estado que al vino producido localmente. En el primer caso, como el Estado también actuaba como participante en el mercado al favorecer sus bonos frente a los bonos extranjeros, la contribución discriminatoria era válida. Ese elemento no es-taba presente en el segundo pleito. Igual ocurrió en General Motors Corp. v. Tracy, supra, en el que se dio un tratamiento contributivo preferencial a entidades públicas.

(74) A esto se le llama “compensatory tax” y está “diseñado simplemente para hacer que el comercio interestatal asuma un cargo que ya ha sido asumido por el comercio intraestatal”. Fulton Corp. v. Faulkner, supra, pág. 325: “[D]esigned to make interstate commerce bear a burden already borne by intrastate commerce”.

(75) Camps Newfound/Owatanna, Inc. v. Town of Harrison, Me., supra, pág. 593: “[Assessment and computation of taxes”.

(76) Id., pág. 589. “A pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business”. Esta expresión es altamente pertinente al caso de autos, pues el propio Tribunal Supremo federal, en casos de expresión gubernamental subsidiada, ha acortado la distancia entre el subsidio que proviene del fondo general y el que se obtiene mediante una contribución especial. Véase, además, id., pág. 590. “Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation does”.

(77) La Opinión mayoritaria, págs. 76-77, cita al Tribunal Supremo federal en West Lynn Creamery, Inc. v. Haley, 512 U.S. 186, 201 (1994), pero trastoca el significado del texto citado.

(78) Id. “The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce”.

(79) Maine v. Taylor, supra, pág. 144. “[Elmpirical component of that scrutiny”.

(80) Véase White v. Massachusetts Council of Contr. Employers, Inc., supra, pág. 214 esc. 12. A igual conclusion se llegó en Building Trades v. Mayor of Camden, supra, ante un argumento presentado por primera vez en la etapa apelativa.

(81) Granholm v. Heald, supra, pág. 493.

(82) Maine v. Taylor, supra, pág. 151.

(83) American Trucking Assns., Inc v. Michigan Pub. Serv. Comm’n, supra, pág. 434.

(84) General Motors Corp. v. Tracy, supra, pág. 311: “[I]n some peculiar circumstances!,] state tax classifications facially discriminating against interstate commerce may violate the Equal Protection Clause even when they pass muster under the Commerce Clause”.

(85) Por ejemplo, el Gobierno de Puerto Rico, como participante en el mercado, no podría decidir comprarle únicamente a negocios que pertenezcan a personas de determinada raza, según la prohibición de discrimen que establece nuestra Constitución.

(86) Hughes v. Alexandria Scrap Corp., supra, pág. 813. “[U]pon no fundamental interest”.

(87) Id. “[0]ne dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purpose animating it”.

(88) También hubo un ataque al amparo de la cláusula de comercio en su estado durmiente pero, al igual que en White v. Massachusetts Council of Contr. Employers, Inc., supra, se resolvió que operaba la excepción de participante en el mercado que evitaba un análisis según dicha disposición constitucional.

(89) Building Trades v. Mayor of Camden, supra, pág. 218. “Application of the Privileges and Immunities Clause to a particular instance of discrimination against *136 out-of-state residents entails a two-step inquiry. As an initial matter, the court must decide whether the ordinance burdens one of those privileges and immunities protected by the Clause. Not all forms of discrimination against citizens of other States are constitutionally suspect”.

(90) íd. “[Flundamental to the promotion of interstate harmony”.

(91) íd., pág. 222. “[Substantial reason for the difference in treatment ... and whether the degree of discrimination bears a close relation to them”.

(92) íd., pág. 219. “[W]e decline to transfer mechanically into this context an analysis fashioned to fit the Commerce Clause”. La diferencia fundamental entre ambas disposiciones es que la cláusula de comercio protege al comercio interestatal mientras que la cláusula de privilegios e inmunidades protege a los residentes de otros estados. íd., pág. 220.

(93) íd., págs. 222-223. “Every inquiry under the Privileges and Immunities Clause must be conducted with due regard for the principle that States should have considerable leeway in analyzing local evils and in prescribing appropriate cures”.

(94) No obstante, el Tribunal sí enfatizó en los argumentos presentados por el municipio de que la ordenanza era necesaria debido a los serios problemas sociales y económicos enfrentados por la ciudad, aumento en el desempleo, descenso significa-tivo en la población, que la reducción dramática en el número de negocios localizados en la ciudad había impactado el valor de las propiedades y afectaba negativamente la base contributiva de la ciudad. Además, la ciudad alegó que la ordenanza no era *137 innecesariamente amplia, pues solamente reservaba el 40% de los puestos a residen-tes de la ciudad, dejando el 60% para no residentes. íd., pág. 222.

(95) En estos casos, la participación en el mercado por parte del Estado se da, precisamente, mediante su expresión. “When speech falls within the category of government speech, it is immunized from any meaningful First Amendment free speech scrutiny .... The government becomes a ‘market participant’ in the marketplace of ideas rather than a regulator of that marketplace, analogous to the dormant Commerce Clause immunity of state and local governments when they are market participants”. S. Nahmod, Justice Souter on Government Speech, 2010 B.Y.U.L. Rev. 2097 esc. 1 (2010).

(96) para una discusión sobre las diferentes posiciones sobre la excepción del participante en el mercado, particularmente en contraposición al elemento coercitivo de la función reguladora, véase D.T. Coenen, Untangling the Market-Participant Exemption to the Dormant Commerce Clause, 88 Mich. L. Rev. 395 (1989).

(97) Recordemos que la deuda de Northwestern asciende a $301,526.28, mien-tras que el costo de la campaña fue de $279,869.85, y que para el año fiscal 1994-1995, el Fondo contaba con $769,575.86.

(98) Wooley v. Maynard, 430 U.S. 705, 714 (1977). “[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all”.

(99) Abood v. Detroid Bd. Of Ed., 431 U.S. 209, 234-235 (1977). “[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one’s beliefs should be shaped by his mind and his conscience, rather than coerced by the State”. Por ejemplo, el Tribunal Supremo federal declaró inconstitucional una ley que obliga a un periódico a publicar la con-testación de un candidato electivo a un artículo escrito por dicha entidad en el que se le atacaba. Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241 (1974).

(100) Véase Abood v. Detroit Bd. ofEd., supra; Keller v. State Bar of California, 496 U.S. 1 (1990).

(101) 521 U.S. 457 (1997).

(102) p¿g 409

(103) (Traducción nuestra). Id., págs. 469-470. “Three characteristics of the regulatory scheme at issue distinguish it from laws that we have found to abridge the freedom of speech protected by the First Amendment”.

(104) íd.

(105) (Traducción nuestra). íd., pág. 471. “[CJannot be said to engender any crisis of conscience”.

(106) 533 U.S. 405 (2001).

(107) íd., pág. 411.

(108) 544 U.S. 550 (2005).

(109) jo ; p¿g 5g3_ “por the third time in eight years, we consider whether a federal program that finances generic advertising to promote an agricultural product violates the First Amendment. In these cases, unlike the previous two [Glickman; United Foods ], the dispositive question is whether the generic advertising at issue is the Government’s own speech and therefor is exempt from First Amendment scrutiny”.

(110) (Traducción nuestra). íd. “[Alnnounces a federal policy of promoting the marketing and consumption of beef and beef products, using funds raised by an assessment on cattle sales and importation”.

(111) (Traducción y énfasis suplidos). íd., pág. 557. “We have sustained First Amendment challenges to allegedly compelled expression in two categories of cases: true ‘compelled speech’ cases, in which an individual is obligated personally to express a message he disagrees with, imposed by the government; and ‘compelled-subsidy’ cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity. We have not heretofore considered the First Amendment consequences of government-compelled subsidy of the government’s own speech”. (Enfasis suplido).

(112) íd., pág. 558.

(113) íd., pág. 559.

(114) (Traducción nuestra y énfasis en el original). íd., pág. 562. “The compelled-subsidy analysis is altogether unaffected by whether the funds for the promotions are raised by general taxes or through targeted assessment”.